190 Wis.2d 651

**CARLSON & ERICKSON BUILDERS, INC., Plaintiff–Respondent–Cross Appellant–Petitioner,**

v.

**LAMPERT YARDS, INC., Portside Properties, Inc. and Door County Material Specialists, Inc., Defendants–Appellants–Cross Respondents.[†]**

No. 93–0195.

Supreme Court of Wisconsin.

Oral Argument Jan. 10, 1995.

Opinion Filed March 7, 1995.

[†] Motion for Reconsideration Denied.

For the plaintiff-respondent-cross appellant-petitioner there were briefs by Robert L. Binder, William M. Conley, Lynn J. Splitek and Foley & Lardner, Madison and oral argument by William M. Conley.

For the defendants-appellants-cross respondents, Lampert Yards, Inc., there was a brief by Tom Rusboldt and Nash, Spindler, Dean & Grimstad, Manitowoc and oral argument by Tom Rusboldt.

For the defendants-appellants-cross respondents, Portside Properties, Inc. and Door County Material Specialists, Inc., there was a brief by William J. Ewald, Erik J. Pless and Denissen, Kranzush, Mahoney & Ewald, S.C., Green Bay and oral argument by William J. Ewald.

Amicus curiae brief was filed by Roy R. Korte, Asst. Atty. Gen. with whom on the brief was James E. Doyle, Atty. Gen. and oral argument by Roy R. Korte.

SHIRLEY S. ABRAHAMSON, Justice.

This is a review of a published decision of the court of appeals, *Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 183 Wis.2d 220, 515 N.W.2d 305 (Ct.App.1994), reversing in part and affirming in part an order of the circuit court for Door county, John D. Koehn, circuit judge. We reverse the decision of the court of appeals.

Two questions are presented to this court: (1) Which burden of proof applies to private, civil antitrust actions under Chapter 133, Stats. 1991–92, the Wisconsin antitrust law?

(2) Did the circuit court err in ordering a remittitur?

The plaintiff, Carlson & Erickson Builders, commenced this private, civil antitrust action against defendants Lampert Yards, Inc., Portside Properties, Inc., and Door County Material Specialists, Inc., (DCMS), in July of 1990. The circuit court instructed the jury on the ordinary, civil burden of proof. Applying this burden of proof, the jury found that Lampert Yards had intentionally discriminated in price between the plaintiff and Portside Properties and that it had allowed unearned discounts and extended special services and privileges not extended to all purchasers upon like terms and conditions in violation of secs. 133.04 and 133.05, Stats. 1991–92.

The court of appeals concluded that the middle burden of proof was applicable and remanded the cause to the circuit court for a new trial on all issues. We conclude that the circuit court properly determined the burden of proof. Accordingly, we reverse the decision of the court of appeals.

Because the court of appeals remanded for a new trial on all issues, it did not address Carlson & Erickson Builders' cross appeal challenging the circuit court's remittitur order. By its cross appeal, Carlson & Erickson Builders preserved its right of appeal on this issue. Carlson & Erickson Builders asks this court to decide the issue on the briefs or remand the issue to the court of appeals for decision. After examining all the parties' briefs on this issue, we decide this

issue rather than remand it to the court of appeals in order to advance the interests of judicial economy, speedy resolution of appeals, reduced costs to the litigants, and finality of decisions.[1] After reviewing the record, we conclude that the circuit court erred in determining that the jury's award was excessive and in ordering remittitur.[2] Accordingly, we remand the cause to the circuit court with directions to vacate the circuit court's remittitur, to determine the cost of the suit, including reasonable attorney fees, and to enter judgment in accordance with the jury award of damages ($177,100), trebled, and the cost of the suit, including reasonable attorney fees, as the circuit court determines.

**I.**

We turn first to the question of the burden of proof (persuasion) standard in private, civil antitrust actions under chapter 133. Because the facts upon which the jury decided liability and damages are not relevant for this issue, we do not recite them.

Wisconsin law recognizes three degrees of burden of proof. In criminal cases the jury is told that the state has the burden to convince the jury beyond a reasonable doubt.[3] In certain civil cases, a higher civil standard is used; the jury is told that a party has the burden to convince the jury to a reasonable certainty by evidence that is clear, satisfactory and convincing.[4] In most civil cases the lower, ordinary burden of proof applies; the jury is told that a party has the burden to satisfy the jury to a rea-

1. Defendant Lampert Yards, Inc. asks us to exercise our discretion to review its challenge in the court of appeals to the sufficiency of the evidence on liability. The court of appeals examined the record and addressed the question of the sufficiency of evidence to support the verdict, concluding that there was "extensive evidence" on each of the elements and that "the trial court properly denied defense motions for summary judgment, directed verdict and judgment notwithstanding the verdict." *Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 183 Wis.2d 220, 231–32, 515 N.W.2d 305 (Ct.App.1994). Therefore we decline to undertake this review.

2. The circuit court granted Carlson & Erickson Builders the option of a reduced verdict of $67,-

907.65 (trebled as provided in sec. 133.18(1)(a), Stats.1991–92) or a new trial on damages. (The jury found the sum of $177,100 would fairly and reasonably compensate the plaintiff for its injury.)

3. Wis JI–Criminal 140 (Rel. No. 32—11/94) provides *inter alia:* "Before you can return a verdict of guilty, the evidence must satisfy you beyond a reasonable doubt that the defendant is guilty."

4. Wis. JI—Civil 205 (1990) sets forth the "middle" burden of proof as follows: "The burden of proof ... is ... to convince you to a reasonable certainty by evidence that is clear, satisfactory, and convincing ..."

sonable certainty by the greater weight of the credible evidence.[5]

Determination of the appropriate burden of proof in this case presents a question of statutory interpretation, a question of law which this court determines independently of other courts, benefitting from their analyses.[6] The principal objective of statutory interpretation is to ascertain and give effect to the intent of the legislature.

The statute is silent about the burden of proof in antitrust cases. No statutory history exists on the specific issue of the burden of proof for a civil violation of ch. 133. We must therefore look to other indicia of legislative intent.

According to the defendants, one indicator of legislative intent is the longstanding Wisconsin case law applying the middle burden of proof in cases which the defendants analogize to antitrust cases.[7] The defendants exhort us to conclude that the legislature intended ch. 133 to incorporate this body of law.

Wisconsin cases have long applied the middle burden in civil actions involving such matters as punitive damages, conduct that could be prosecuted as a crime, and allegations of fraud and undue influence.[8] The court has explained that a greater degree of certitude is required in these cases because these matters are more serious than the factual issues in the ordinary civil case and fall within "certain classes of acts for which stigma attaches." *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 300, 294 N.W.2d 437 (1980).

The defendants argue that a private, civil antitrust action is similar to cases in which the courts have applied the middle burden. They analogize treble damages awarded in a successful private, civil antitrust action to punitive damages to which the middle burden applies.[9] Further they point out that the

---

5. Wis JI–Civil 200 (1991) provides: "The burden of proof ... is to satisfy you to a reasonable certainty by the greater weight of the credible evidence.... By the greater weight of the evidence is meant evidence which when weighed against evidence opposed to it has more convincing power."

6. "Where Congress has not prescribed the appropriate standard of proof and the Constitution does not dictate a particular standard, we must prescribe one." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983).

7. The parties cite no Wisconsin case, nor have we located one, that specifically addresses the applicability of the middle burden of proof to a private, civil antitrust cause of action.
   In *State v. Fonk's Mobile Home Park and Sales Inc.*, 133 Wis.2d 287, 301, 395 N.W.2d 786 (Ct. App.1986), the court of appeals applied the middle burden of proof to a civil action for violation of the administrative regulations relating to Wisconsin's Unfair Trade Practices Act; sec. 100.20 declares violations of regulations punishable as crimes. The question of the appropriate standard of proof was not, however, at issue in *Fonk's*; the parties in *Fonk's* had agreed that the middle burden applied.

8. *Macherey v. Home Ins. Co.*, 184 Wis.2d 1, 16–17, 516 N.W.2d 434 (Ct.App.1994) (middle burden in civil battery case); *State v. Fonk's Mobile Home Park*, 133 Wis.2d 287, 301, 395 N.W.2d 786 (Ct.App.1986) (middle burden in civil action for violation of administrative code when conduct subject to criminal penalties) *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 300, 294 N.W.2d

437 (1980) (middle burden in civil action for punitive damages in claim for willful, wanton, reckless and outrageous conduct); *Madison v. Geier*, 27 Wis.2d 687, 692, 135 N.W.2d 761 (1965) (middle burden in civil statutory forfeiture action when conduct constitutes a crime); *Ziegler v. Hustisford Farmers Mut. Ins. Co.*, 238 Wis. 238, 241, 298 N.W. 610 (1941) (middle burden in civil action for damages caused by arson); *Poertner v. Poertner*, 66 Wis. 644, 647, 29 N.W. 386 (1886) (middle burden in divorce case for factual issue of adultery, a criminal offense).

In a parole revocation hearing, a statutorily prescribed proceeding, the court did not look to the line of civil cases applying the middle burden of proof but rather applied the ordinary burden of proof, even though the basis for the revocation was allegedly criminal conduct. *State ex rel. Flowers v. H & SS Dept.*, 81 Wis.2d 376, 387–88, 260 N.W.2d 727 (1978).

For discussions of the higher standard of proof in civil cases, see Note, *Appellate Review in the Federal Courts of Findings Requiring More than a Preponderance of the Evidence*, 60 Harv.L.Rev. 111 (1946); 2 McCormick on Evidence sec. 340 (4th ed. 1992).

9. *See John Mohr & Sons, Inc. v. Jahnke*, 55 Wis.2d 402, 411–412, 198 N.W.2d 363 (1972) (viewing punitive damages and treble damages as overlapping and refusing to award punitive damages with an award of treble damages); and *Kink v. Combs*, 28 Wis.2d 65, 80, 135 N.W.2d 789 (1965) (comparing similarities of punitive damages and treble damages).

The court has recognized, however, that common-law punitive damages are "distinguishable

conduct prohibited under chapter 133 may subject the perpetrator to criminal penalties, secs. 133.04(2) and 133.05(4), Stats.1991–92, and that in civil actions in which criminal conduct is involved the middle burden has been applied. In addition, defendant Portside Properties, Inc., contends that a civil violator of the antitrust statutes is in effect accused of dishonesty in business and suffers the loss of reputation. Portside Properties asserts that Fran Shefchik, a principal owner of Portside and part owner of DCMS, is subject "to a stigma no less dishonorable than other tortious conduct that must be proven to an elevated degree of certainty." [10]

Accordingly, the defendants urge the court to follow this line of cases applying the middle burden of proof and to hold that, because treble damages in private, civil antitrust actions are comparable to punitive damages, and because violations of the antitrust laws may constitute a crime and stigmatize the defendants, the added protections of the middle burden are required in this private, civil antitrust action. The court of appeals adopted this approach in interpreting ch. 133.

Standing alone without analysis of the purpose and policies of the private, civil antitrust suit, the analogy between the cases imposing the middle burden of proof and treble damages in a private, civil antitrust action may seem apt. Yet, the court must examine the cases imposing the middle burden of proof—imposing a barrier to a claimant's relief—in the context of the purpose of the private, civil antitrust action.[11] Our examination of the purpose and policies underlying the antitrust law convinces us that the legislature intended the ordinary, lower civil burden of proof to apply to antitrust actions. This lower burden of proof advances the legislature's purpose in enacting the antitrust law and comports with Wisconsin's longstanding tradition of adhering to interpretations of the federal antitrust laws on which chapter 133 is based.

Antitrust laws are intended to prevent restraints on free competition, restraints which can harm purchasers, consumers of goods and the public. The importance of the antitrust laws in preventing monopolies and encouraging competition, "the fundamental economic policy of this state," is directly reflected in the statement of legislative intent in sec. 133.01, Stats. 1991–92, and in the case law. *American Medical Transport v. Curtis–Universal Inc.*, 154 Wis.2d 135, 151, 452 N.W.2d 575 (1990); *Madison v. Hyland, Hall & Co.*, 73 Wis.2d 364, 373, 243 N.W.2d 422 (1976), appeal dismissed sub nom. 429 U.S. 953, 97 S.Ct. 373, 50 L.Ed.2d 320 (1976). The legislature commands in sec. 133.01 that ch. 133 be given "the most liberal construction to achieve the aim of competition." [12]

---

from statutory multiple damages" and "the two forms of damages must be treated separately." *Cieslewicz v. Mutual Serv. Casualty Ins. Co.*, 84 Wis.2d 91, 101–103, 267 N.W.2d 595 (1978). For example, willful, wanton or reckless behavior which must be proven to recover punitive damages need not be proven to recover treble damages against public utilities in negligence actions brought under sec. 196.64. *Peissig v. Wisconsin Gas Co.*, 155 Wis.2d 686, 692, 456 N.W.2d 348 (1990). The wealth of a defendant has a bearing on the calculation of punitive damages, while statutory multiple damages is based on an automatic multiplier of compensatory damages. *Peissig v. Wis. Gas Co.*, 155 Wis.2d 686, 696, 456 N.W.2d 348 (1990). Furthermore, in a punitive damage case the middle burden is applicable only to determine punitive damages, not compensatory damages. *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 300, 294 N.W.2d 437 (1980). In this case the defendants urge that all issues under ch. 133 be subject to the middle burden.

**10.** *Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 183 Wis.2d 220, 229, 515 N.W.2d 305 (Ct.App.1994). Although the corporation is the civil violator, Portside claims that the stigma attaches to individuals.

**11.** *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 388–90, 103 S.Ct. 683, 690–92, 74 L.Ed.2d 548 (1983) (applying the lower burden of proof in action under Securities Exchange Act of 1934 rather than middle burden applied in common law fraud cases; "references to common-law practices [in cases involving statutes] can be misleading").

**12.** Sec. 133.01, Stats.1991–91, provides:

**133.01 Legislative Intent.** The intent of this chapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition. It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition. It is the intent of the legislature to make competition the fundamental economic policy of this

The Wisconsin legislature determined that private, civil antitrust suits are important methods of enforcing chapter 133. To encourage private enforcement, the legislature built incentives into the statute. These include tolling the statute of limitations under certain circumstances, allowing the cost of the suit, including reasonable attorney fees to prevailing claimants, awarding treble damages,[13] and granting expedited treatment to civil antitrust actions in the courts. Section 133.18(1)(a), (3), (5); *Kink v. Combs*, 28 Wis.2d 65, 80–81, 135 N.W.2d 789 (1965). Under this legislative scheme, a private party "performs the office of a private attorney general," when bringing a civil antitrust action, *Associated General Contractors of Calif., Inc. v. California State Council*, 459 U.S. 519, 542, 103 S.Ct. 897, 911, 74 L.Ed.2d 723 (1983),[14] and significantly supplements the government's limited resources for enforcing antitrust law. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979).[15]

■ Thus, there is a "longstanding policy of encouraging vigorous private enforcement of antitrust laws."[16] We must construe and apply the antitrust laws with the important role of private actions in mind. The court assumes that the legislature intended an in-terpretation that advances, not hinders, the purposes of the statute.

■ Applying the ordinary civil burden of proof to private, civil antitrust actions bolsters the legislative purpose of the antitrust statutes. The ordinary civil burden of proof standard allows both parties to "share the risk of error roughly in equal fashion." *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). *See also Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). The middle burden, on the other hand, expresses a preference for the defendant's interests. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983). Interpreting the antitrust statute to require this middle burden of proof would impede the private litigant and might undermine the enforcement of the antitrust laws by private litigants, contrary to the legislative intent.[17]

Application of the lower, ordinary burden of proof also comports with the federal courts' interpretation of federal antitrust law. At the time of the enactment of the Wisconsin antitrust law, the Wisconsin legislature intended to follow interpretations of the federal act for those sections of ch. 133 that were patterned after the federal Sherman

state and, to that end, state regulatory agencies shall regard the public interest as requiring the preservation and promotion of the maximum level of competition in any regulated industry consistent with the other public interest goals established by the legislature.

13. The purpose of treble damages in chapter 133 is to give citizens an incentive to prosecute actions under chapter 133. *Gerol v. Arena*, 127 Wis.2d 1, 10, 377 N.W.2d 618 (Ct.App.1985), citing *Kink v. Combs*, 28 Wis.2d 65, 80, 135 N.W.2d 789 (1965).

14. The self-interest of individuals and business makes the private party an excellent antitrust enforcer and is the cornerstone of competitive capitalism. Paul S. Ferber, *Introductory Comments: Antitrust Symposium: The Effectiveness of the Private Treble Damages Action As An Antitrust Enforcement Mechanism*, 8 Sw.U.L.Rev. 505, 507 (1976); Maxwell M. Blecher, *The Only Game in Town*, 8 Sw.U.L.Rev. 550, 556 (1976).

15. Many reported state and federal antitrust cases arise in actions brought by private parties. Neil Hamilton & Virginia B. Cone, *Mitigation of Antitrust Damages*, 66 Or.L.Rev. 339, 350–51 (1987); Richard Posner, *A Statistical Study of Antitrust Enforcement*, 13 J. Law & Econ. 365, 388–95 (1970).

16. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977). *See also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972).

17. *Blue Shield v. McCready*, 457 U.S. 465, 472, n. 9, 102 S.Ct. 2540, 2545 n. 9, 73 L.Ed.2d 149 (1982) ("in the face of [the congressional antitrust policy] this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress"); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 486, n. 10, 97 S.Ct. 690, 696, n. 10, 50 L.Ed.2d 701 (1977) (treble damages under the Sherman Act were provided to make the remedy meaningful by counterbalancing the difficulty of maintaining a private suit).

Act.[18] *Madison v. Hyland, Hall & Co.,* 73 Wis.2d 364, 375, 243 N.W.2d 422 (1976), appeal dismissed sub nom. 429 U.S. 953, 97 S.Ct. 373, 50 L.Ed.2d 320 (1976). While federal cases construing federal law are not controlling on Wisconsin courts' interpretations of state statutes, over the years the courts have looked to federal antitrust decisions for guidance when the language and policy of the federal and state antitrust statutes are substantially similar and when Wisconsin case law on an issue is "scarce."[19] The language and goals of the federal and Wisconsin antitrust statutes are substantially similar. Wisconsin law on burden of proof in private, civil antitrust cases is non-existent.

Federal courts have applied the ordinary standard of proof to private, civil antitrust cases.[20] According to the defendants, the federal law on the standard of proof should not apply because treble damages in antitrust actions have been characterized differently in federal and Wisconsin cases. The defendants claim that the purpose of treble damage awards in federal antitrust cases is to encourage private enforcement of the antitrust laws and supplement the government enforcement apparatus. Thus federal law characterizes treble damages as "designed primarily as a remedy."[21] The defendants argue that the Wisconsin courts, in contrast, view the treble damage award as punitive in nature to the extent damages exceed actual damages.[22] We do not agree with the defendants' characterization of either federal or state treble damages in private, civil antitrust cases. The United States Supreme Court has recognized both the remedial and penal aspects of treble damages in such federal actions.[23] Nor are treble damages in Wisconsin private, civil antitrust actions solely or predominantly punitive, as the defendants assert. A more accurate portrayal of the case law is that the state "antitrust laws are remedial in nature as well as penal," *Madison v. Hyland, Hall & Co.,* 73 Wis.2d

**18.** Defendant Lampert Yards points out that there are differences between secs. 133.04 (relating to price discrimination) and 133.05 (relating to secret discounts) and their federal prototypes. These differences in the underlying claims in the federal and state statutes are not determinative of the issue of the burden of proof. More significant than these differences is the similarity of the private right of action in both the federal and state statutes.

**19.** *Grams v. Boss,* 97 Wis.2d 332, 346, 294 N.W.2d 473 (1980); *State v. Waste Management of Wis., Inc.,* 81 Wis.2d 555, 569, 261 N.W.2d 147, cert. den., 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 175 (1978); *Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 157 Wis. 604, 625, 147 N.W. 1058 (1914), 168 Wis. 400, 404–05, 170 N.W. 230 (1919); *Jauquet Lumber Co. v. Kolbe & Kolbe Millwork,* 164 Wis.2d 689, 701, 476 N.W.2d 305 (Ct.App.1991); *Independent Milk Producers Co-op v. Stoffel,* 102 Wis.2d 1, 6–7, 298 N.W.2d 102 (Ct.App.1980).

For an analysis of the historical development of antitrust law in Wisconsin, see Ralph J. Geffen, *Antitrust Law in Wisconsin: Historical Development,* 1951 Wis.L.Rev. 657.

**20.** *Ramsey v. United Mine Workers,* 401 U.S. 302, 307–11, 91 S.Ct. 658, 662–64, 28 L.Ed.2d 64 (1971) (reversing court of appeals and holding that ordinary burden of proof applies in civil antitrust actions against labor union).

**21.** *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 485–86, 97 S.Ct. 690, 695–96, 50 L.Ed.2d 701 (1977). *See also Blue Shield v.*

*McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 2544, 73 L.Ed.2d 149 (1982) (treble damages have an "expansive remedial purpose").

**22.** *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis.2d 402, 411, 198 N.W.2d 363 (1972) (to encourage private enforcement of the antitrust laws "is not the *sole* reason for the enactment of the law in Wisconsin. Our court has long taken the view a statute creating a cause of action for treble damages is punitive ... to the extent damages above the actual damages are recovered...." (emphasis added)); *Oconto County v. Union Mfg. Co.,* 190 Wis. 44, 48, 208 N.W. 989 (1926) (all damages above actual damages in suit for statutory treble damages for obstructing water are punitive in their nature).

For discussions of the penal and remedial nature of treble damages, *see, e.g.,* Robert H. Lande, *Are Antitrust "Treble Damages" Really Single Damages?,* 54 Ohio St.L.J. 115 (1993) (positing that " 'treble damages' actually awarded are probably at most as large as the damages caused by the violation"); Lawrence Vold, *Are Threefold Damages Under the Antitrust Act Penal or Compensatory?,* 28 Ky.L.J. 117 (1940) (contending that criminal penalty is punishment; treble damages are compensation for ordinarily nonrecoverable damages).

**23.** *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 485–86, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977) (treble damages are "in essence a remedial provision [but] also play an important role in penalizing wrongdoers and deterring wrongdoing").

364, 373, 243 N.W.2d 422 (1976), appeal dismissed sub nom. 429 U.S. 953, 97 S.Ct. 373, 50 L.Ed.2d 320 (1976), and that "both treble and actual damages are integral to the remedial aspects of the act." *Id.*, 73 Wis.2d at 374, 243 N.W.2d 422.

Based on this examination of the purpose and policies underlying antitrust law, including the federal courts' application of the lower, ordinary burden, upon which the plaintiff and the state in its amicus brief rely, we conclude that the legislature intended the ordinary burden of proof to apply to private, civil antitrust claims under chapter 133.

## II.

■ We next consider the question of the remittitur. The rule for remittitur was established by *Powers v. Allstate Ins. Co.*, 10 Wis.2d 78, 91–92 102 N.W.2d 393 (1960). In *Powers* the court declared that when an excessive verdict is not due to perversity or prejudice, and is not the result of error at trial, the circuit court should grant the prevailing party two options. The prevailing party may remit (1) the excess over and above such a sum as the court shall determine is the reasonable amount of the party's damages, or (2) request a new trial on the issue of damages. To determine whether a verdict on damages is excessive, the circuit court should review all the evidence on damages and view that evidence in the light most favorable to the jury verdict.[24] The *Powers* rule also requires the circuit court to state its rationale for determining that the verdict is excessive.[25]

■ The standard for appellate review of a circuit court's remittitur order was also established by *Powers v. Allstate Ins. Co.*, 10 Wis.2d 78, 102 N.W.2d 393 (1960). The *Powers* court recognized that the circuit court which sees and hears the witnesses has an advantage over an appellate court which can only review the record. Thus a reviewing court will reverse a circuit court's remittitur order only when it finds that the circuit court erroneously exercised its discretion.[26] A reviewing court will not reverse a circuit court's discretionary determination if the record shows that discretion was in fact exercised and there exists a reasonable basis for the circuit court's determination after resolving any direct conflicts in the testimony in favor of the prevailing party, even if the reviewing court would have reached a different conclusion than the circuit court.[27]

■ If, however, a circuit court fails to analyze the evidence supporting its conclusion that the damage award is excessive, or fails to state the reasoning behind its decision, the reviewing court should place no weight upon the trial court's findings. In such a situation, the reviewing court must then review the entire record and determine, as a matter of first impression, whether the jury award is excessive.[28] In conducting its analysis, the reviewing court must view the evidence in the light most favorable to the party prevailing with the jury.[29]

In its written ruling on the defendants' motion to reduce the verdict in this case, the

24. *Olson v. Siordia*, 25 Wis.2d 274, 284–85, 130 N.W.2d 827 (1964); *Kincannon v. National Indemnity Co.*, 5 Wis.2d 231, 233, 92 N.W.2d 884 (1958); *Lucas v. State Farm Mut. Automobile Ins. Co.*, 17 Wis.2d 568, 571, 117 N.W.2d 660 (1962), cert. den., 373 U.S. 922, 83 S.Ct. 1522, 10 L.Ed.2d 423 (1963).

25. *See, e.g., Fahrenberg v. Tengel*, 96 Wis.2d 211, 229–31, 291 N.W.2d 516 (1980); *Ostreng v. Lowrey*, 37 Wis.2d 556, 560–61, 155 N.W.2d 558 (1968).

26. *Koele v. Radue*, 81 Wis.2d 583, 587, 260 N.W.2d 766 (1978).

27. *Olson v. Siordia*, 25 Wis.2d 274, 284–85, 130 N.W.2d 827 (1964); *Boodry v. Byrne*, 22 Wis.2d 585, 589, 126 N.W.2d 503 (1964).

28. *Fahrenberg v. Tengel*, 96 Wis.2d 211, 230, 291 N.W.2d 516 (1980) (circuit court found damages excessive); *Ostreng v. Lowrey*, 37 Wis.2d 556, 561, 155 N.W.2d 558 (1968) (jury damage award upheld by trial court); *Brogan v. Industrial Cas. Ins. Co.*, 132 Wis.2d 229, 238, 392 N.W.2d 439 (Ct.App.1986) (jury damage award upheld by circuit court).

29. *Koele v. Radue*, 81 Wis.2d 583, 587, 260 N.W.2d 766 (1978); *Boodry v. Byrne*, 22 Wis.2d 585, 589, 126 N.W.2d 503 (1964); *Lucas v. State Farm Mut. Automobile Ins. Co.*, 17 Wis.2d 568, 571–72, 117 N.W.2d 660 (1962), cert. den., 373 U.S. 922, 83 S.Ct. 1522, 10 L.Ed.2d 423 (1963); *Kincannon v. National Indemnity Co.*, 5 Wis.2d 231, 233, 92 N.W.2d 884 (1958).

circuit court summarized the conflicting evidence on damages. The circuit court explained why the plaintiff should not be awarded damages for 1983 and 1989. The circuit court declared, however, without explanation that the jury award was excessive and was not "substantiated by any evidence." The circuit court further asserted that "[i]t appears that the jury simply divided [the plaintiff's expert's highest calculation of damages] in half." The circuit court did not evaluate the evidence or point out in which respects the evidence did not support the jury verdict. It did not explain why the jury's determination of damages, which fell within the range of the evidence on damages, represented an invalid compromise. Furthermore, although the circuit court stated that it was using a 4% differential to calculate the remittitur, it then figured the remittitur on a 5% differential and did not state the basis for its conclusion that the 5% figure or the reduced award was reasonable. While the circuit court did not expressly determine that the jury award was not due to perversity, prejudice or error during the course of trial, that inference can be drawn from the decision.

The circuit court's decision implicitly reduces the award on four grounds: (1) there was no basis for the jury's calculation of a 7½% price differential; (2) it appears the jury simply divided in half the maximum damages to which a plaintiff's expert witness testified; (3) no damages should be awarded for the entire year of 1983 or for part of 1989, because there was no evidence of discrimination during 1983 and no proof of damages was set forth for the part of 1989 during which there were secret rebates; and (4) the jury's ap-

parent award for the effects of inflation was void as pre-verdict interest.

We conclude that the circuit court erred in failing to look at the evidence in the light most favorable to the plaintiff, in determining that there was not sufficient evidence to support the jury's verdict, and in concluding that the award was excessive.

The evidence on damages is set forth briefly. The parties presented evidence that the prices Lampert Yards charged the plaintiff for building materials were higher than the prices charged Portside Properties and DCMS for the years 1983–1989.[30] Because exact documentation was not available, witnesses used varying methods of evaluation and drew conflicting conclusions about the extent, if any, of the differential. Despite the differing calculations and conclusions of the witnesses, the evidence, taken as a whole, suggested a likely range of price differences for various items sold by Lampert Yards.

Plaintiff's witnesses testified that Lampert Yards discounted goods sold to Portside Properties from about 12% to 20%. The plaintiff's expert witness, although not purporting to determine the actual price cut extended to either Portside Properties or DCMS, calculated the plaintiff's damages based on discounts of 5%, 10%, and 15% of the estimated amount of materials purchased from Lampert Yards.[31]

The defendants have argued throughout the course of this case that the plaintiff has suffered no damages. One defense witness testified that Lampert Yards charged DCMS, depending on the year, between 2% and 7.5% less than the supplier charged the plaintiff. Another testified that Lampert

---

30. Aside from the higher material prices, there was evidence of the plaintiff's profits and losses for various years but the amount of loss of profits caused by Lampert Yards was not shown in any detail except for the increased cost of materials.

31. The plaintiff's expert, Professor J.R. Nevin, calculated the overcharge based upon the depositions, the plaintiff's financial statements, interviews with plaintiff's principals and accountant, and market data regarding the construction industry in Door county. He estimated the percentages of purchases made by the plaintiff from Lampert Yards and then assumed and assigned different percentages of overcharges to the plain-

tiff compared to charges to Portside Properties and DCMS. In addition he added an "inflation adjustment factor which increased each year's overcharge figure to a present day value." Using the calculation of a 15% overcharge to the plaintiff compared to the charges to the other defendants, Professor Nevin concluded that the overcharge was $354,200; using a 10% calculation of overcharge resulted in damages of $236,134; and using a 5% calculation of overcharge resulted in damages of a total of $118,067. Professor Nevin's calculations did not include damages for specific lost sales to Portside Properties or damages for lost profits or lost reputation.

Yards discounted its sales to Portside Properties by 4% to 8%. The defendants' expert witness calculated a price difference of 4.6% to 4.7%. Defense witnesses concluded, however, that the discounts were immaterial and the plaintiff suffered no damages, because of a variety of factors including market conditions, the plaintiff's methods of doing business, and Lampert Yards' performing functions for the plaintiff which the other defendants provided for themselves. The defendants' position throughout this case has been that the plaintiff suffered no damage.

■ The jury set damages at $177,000. This figure would, the circuit court computed, reflect a 7½% differential in prices, exactly one-half of the highest calculation offered by the plaintiff's expert. The circuit court then concluded that this "figure is not substantiated by any evidence." While it is true that there was no definitive proof of the *exact* price differential, and no evidence explicitly established an exact 7½% price differential, evidence of damages is sufficient if it enables the fact-finder to make a fair and reasonable approximation. *Brogan v. Industrial Cas. Ins. Co.*, 132 Wis.2d 229, 240, 392 N.W.2d 439 (Ct.App.1986).[32] The record reveals a range of damages within which the jury could operate. *Thorp Sales Corp. v. Gyuro Grading Co.*, 111 Wis.2d 431, 444, 331 N.W.2d 342 (1983).

The circuit court apparently concluded that the defendants' evidence placing the cost differential at somewhere between 0 and 7% or 8% was more credible than the plaintiff's evidence of a higher differential and that the years 1983 and 1989 should not be considered for damage purposes. Using the plaintiff's expert's calculations of the plaintiff's purchases from Lampert Yards and 5% as the price differential for the plaintiff's purchases

from Lampert Yards from 1984 to 1988, the circuit court determined reasonable damages of $67,907.65. The defendants assert this figure is virtually identical to a calculation made by one of their witnesses when the year 1989 is excluded and is thus supported by credible evidence. The plaintiff posits various rationales the jury could have used to reach its figure, accepting some or parts of the parties' damages claims and rejecting others.[33]

■ We conclude that the circuit court's decision fails to give sufficient consideration to the evidence supporting the jury's award. When the jury hears conflicting testimony about unliquidated damages, its verdict should not be disturbed on review when it is clear that the award arrived at is well within the range of figures placed in evidence, and that there is credible evidence to sustain the jury's finding. The capacity of the jury to approximate a fair estimate is especially important when the jury is not able to make "an exact mathematical computation" of the claimant's damages. In such a case the jury must use its best judgment to arrive at a fair result and, to that end, its award may reflect a compromise. *Tetzlaff v. Pilot Press, Inc.*, 270 Wis. 214, 217–18, 70 N.W.2d 678 (1955).

■ The witnesses introduced a range of figures, and the defendants introduced evidence discrediting the plaintiff's damage calculations. In reaching a damage award, the jury could have accepted and rejected parts of each party's evidence. The compromise nature of the damage award gives rise to an inference that the jury did in fact proceed in this way, considering both parties' witnesses and attempting to arrive at a reasonable estimate of the plaintiff's damages. *Care Travel Co. v. Pan American World Airways*, 944 F.2d 983, 995 (2d Cir.1991).[34]

---

**32.** Indeed the jury was instructed that "the determination of damages cannot in many instances, such as in the loss of profits, be made exactly or with mathematical precision. You should award damages which will fairly compensate the named party for its injuries. The amount to be inserted by you in answer to the damage question is for you to determine from the evidence.... Examine the evidence carefully and dispassionately and determine your answer from the evidence in the case."

**33.** For example, the plaintiff asserts that the jury could have determined the price differential was 15% but could have accepted various aspects of the defendants' evidence that the plaintiff would not have realized the full 15%.

**34.** Three kinds of "jury compromises" on damages are described in the cases and should be distinguished: A "jury compromise" on damages in a case of unliquidated damages; a "jury compromise" on damages in a case in which the damages are liquidated or the defendant does not

We conclude that the jury's verdict could reasonably have been reached and therefore should have been accepted.

■ The circuit court did not explain why the jury's award was excessive in light of the evidence. Furthermore, the circuit court adopted a 5% price differential with no explanation of why this percentage, rather than 7½%, was reasonable.

Viewing the evidence in the light most favorable to the plaintiff, under either standard of review, erroneous exercise of discretion or *ab initio* review, we conclude that the circuit court erred. Accordingly, we reverse the decision of the court of appeals. We remand the cause to the circuit court with directions to vacate the circuit court's order of remittitur, to determine the cost of the suit, including reasonable attorney fees, and to enter judgment in accordance with the jury award of damages ($177,100), trebled, and the cost of the suit, including reasonable attorney fees, as the circuit court determines.

The judgment of the court of appeals is reversed and the cause is remanded to the circuit court with directions.

contest the damages; and a "compromise verdict."

In a case where damages are *unliquidated* and there is conflicting evidence, a jury may reach a figure that lies somewhere between the parties' claims. Such a verdict, if supported by the evidence, can stand. *National Fire Ins. Co. v. Great Lakes Warehouse Corp.*, 261 F.2d 35, 37–38 (7th Cir.1958).

In a case where damages are *liquidated*, that is, mathematically calculable with certainty, or uncontested by the opposing party, a jury verdict of one-half what the injured party claims (or some other figure substantially less than what that party asserts) shows that the jury did not consider the evidence and that the jury compro- mised between the right of recovery and the amount of recovery. Such a verdict cannot stand. *National Fire Ins. Co. v. Great Lakes Warehouse Corp.*, 261 F.2d 35, 37–38 (7th Cir. 1958).

A "compromise verdict" occurs when the jury, unable to agree on liability, compromises that disagreement and enters a grossly low award of damages. This compromise verdict between liability and recovery cannot stand. *Yarbrough v. Sturm, Ruger & Co.*, 964 F.2d 376, 378–79 (5th Cir.1992); *Pagan v. Shoney's Inc.*, 931 F.2d 334, 339 (5th Cir.1991); *National R.R. Passenger Corp v. Koch Industries*, 701 F.2d 108, 110 (10th Cir. 1983).